(No. 32223.—

THE PEOPLE *ex rel.* John B. Brenza, County Collector, Appellant, *vs.* H. S. EDWARDS, Appellee.

*Opinion filed November 20, 1952—Rehearing denied Jan. 20, 1953.*

JOHN S. BOYLE, State's Attorney, GORDON B. NASH, EDWARD E. PLUSDRAK, FRANK R. SCHNEBERGER, and KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, all of Chicago, (JOSEPH B. FLEMING, THOMAS M. THOMAS, and THOMAS F. SCULLY, of counsel,) for appellant.

MACLEISH, SPRAY, PRICE & UNDERWOOD, of Chicago, (ROBERT S. CUSHMAN, and JOHN J. O'BRIEN, of counsel,) for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This is an appeal from a judgment of the county court of Cook County sustaining an objection to the 1948 taxes levied by the Board of Education of the city of Chicago

and entering judgment in favor of the objector for the amount by which his taxes paid under protest were found to be excessive. Original objections to the application for judgment and order of sale against the property in question were filed on November 19, 1949, but these objections were not disposed of until September 14, 1951, when the court entered its final judgment after hearing evidence on an amended objection which had been filed on August 23, 1951.

The question raised is one of first impression. The theory of the amended objection is that the 1948 levy of the Board of Education was excessive because in the board's budget for that year appropriable assets of the educational, playground, free textbook and teachers' pension funds were understated in the aggregate amount of $1,249,526.88, making the levy excessive to that extent. The assets which are alleged to have been available for appropriation but omitted from the budget are said to have arisen through the board's failure to confine losses in revenue, occasioned by refunds to taxpayers of the invalid portions of the 1940, 1941, and 1942 taxes, to the particular funds in which the illegal items were contained. The board distributed all collections received from its levies for the years 1940, 1941, and 1942, among its several funds in the proportion which the levy for each fund bore to the total levy. Prior to January 1, 1948, the collector had made refunds to objecting taxpayers on account of the illegal portions of the levies for the years 1940, 1941, and 1942. The board did not revise its records to charge the amounts refunded because of illegality to the particular fund in which the illegal levy occurred. The objector contends that the failure of the board to charge the losses to the specific funds which contained the illegal items, and its practice of distributing the revenues to the various funds ratably, resulted in overdistributions to the building fund and the bond and interest fund and corresponding under-

distributions to the educational, free textbook, school playground and teachers' pension funds; that this improper distribution created interfund debts which should have been reflected as credits in the four last-mentioned funds and as assets available for appropriation in the 1948 budget and levy. The interfund debts and credits or items of overdistribution and underdistribution claimed to have existed on January 1, 1948, are:

| Creditor Funds | Amount of Under- distribution | Debtor Funds | Amount of Over- distribution |
|---|---|---|---|
| Educational | $1,193,708.13 | Building | $ 385,100.05 |
| Playground | 2,730.40 | Bond and Interest | 864,426.83 |
| Free Textbook | 11,673.32 | | |
| Teachers' Pension | 41,415.03 | | |
| | $1,249,526.88 | | $1,249,526.88 |

The objector asserts that the failure to treat these credits as assets available for appropriation from the creditor funds makes the 1948 levy for each of the creditor funds excessive in the amount shown.

There is no controversy as to the facts. The history of the tax levies for the years 1940, 1941, and 1942 is as follows: The Board of Education adopted its 1940 budget (also called its appropriation ordinance) on January 10, 1940, and the city council of Chicago adopted the board's tax levy ordinance totaling $65,662,726.03 the following day. On or before January 23, 1940, tax anticipation warrants in the amount of $44,745,000 were sold to finance the operation of the schools for the year, and all budgeted expenditures for 1940 were made during that year or lapsed by operation of law. The 1940 taxes went into collection and became payable on June 1 and September 1, 1941. Final payment on all tax warrants issued against the 1940 levy was made on December 28, 1941. Some taxpayers paid under protest and filed objections contesting the val-

idity of certain items. These objections, totaling $6,101,126 were filed by November 15, 1941. They were disposed of by final judgment on March 20, 1945. Objections to the following items and amounts were sustained:

| Fund | Amount | Objection |
|---|---|---|
| Building | $ 35,000.00 | Item appropriated in improper fund |
| Education Fund Bonds (2nd Series) | 381,644.00 | Invalid bond issue |
| Refunding Bonds of 1935 (1st Series) | 212,525.00 | 1/11 Invalid bond issue |
| Refunding Bonds of 1935 (2nd Series) | 296,069.00 | Invalid bond issue |
| | $925,238.00 | |

By January 1, 1948, $457,450.89 of the total amount held illegal had been refunded by the county collector to taxpayers. These refunds were paid by the collector from the aggregate of school taxes (regardless of the year involved) which were in his hands at the time the refunds were made. As the school taxes for 1940 were collected, they were turned over by the county collector to the school authorities in lump sums, and upon their receipt were distributed among the various funds in the proportion which the total levy for each fund bore to the total levy for all purposes. The amounts ultimately refunded on account of illegal 1940 items were not charged back to the specific fund in which the illegality occurred but all funds shared ratably in the proceeds of the levy regardless of refunds to taxpayers on account of illegalities in certain funds. By January 1, 1948, the Board of Education had collected $54,140,477.54 of the 1940 levy. The board's levy for 1940 was still in collection on January 1, 1948.

Apart from differences in amounts, dates and funds involved, the facts with respect to the 1941 and 1942 levies are the same. The 1941 budget was adopted on January 22, 1941, and the levy in the amount of $68,903,138.70

was passed on February 5, 1941. On February 14, 1941, tax warrants totaling $45,524,000 were sold. All budgeted items for 1941 were spent during 1941 or lapsed by operation of law. Taxes extended on the levy became payable on May 1 and September 1, 1942. Tax warrants issued against the 1941 levy were retired before the end of 1942. Upon application of the collector for judgment and order of sale for delinquent taxes on November 2, 1942, objections in the amount of $12,608,487 were filed on or before November 14, 1942. These objections were disposed of by final judgment entered on January 18, 1946. They were sustained as to the following items and amounts and otherwise overruled:

| Fund | Amount | Objection |
|---|---|---|
| Educational | $ 5,000 | Improper Itemization |
| Building | 783,000 | Items appropriated in improper fund |
| Playground | 10,000 | Item appropriated in improper fund |
| Free textbook | 18,000 | Item appropriated in improper fund |
| Refunding bonds of 1935 (1st Series) | 232,978 | 1/11 Invalid bond issue |
| Refunding bonds of 1935 (2nd Series) | 336,069 | Invalid bond issue |
| | $1,385,047 | |

Between January 18, 1946, and January 1, 1948, $641,718.50 had been refunded by the collector to taxpayers. These refunds were also paid from school taxes in the hands of the collector at the time the refunds were made, regardless of the year for which those taxes had been levied. By January 1, 1948, $59,935,027.43 of the 1941 levy had been collected and distributed in the same manner as to the 1940 levy. As of January 1, 1948, the 1941 levy was still in the process of collection and refunds on account of items held illegal in the 1941 levy were still being paid to taxpayers.

The 1942 levy of the board in the total amount of $68,692,499 was passed by the council on January 23, 1942, following adoption of the budget by the board on January 14. As of January 24, 1942, tax anticipation warrants in the amount of $46,212,000 had been sold. All budgeted items for 1942 were spent during that year or lapsed. The 1942 taxes extended against the levy became payable June 1 and September 1, 1943. Tax warrants issued against the 1942 levy were retired by September 29, 1943, from the proceeds of the levy.

Objections to the 1942 levy filed on November 20, 1943, totaled $20,746,765 and were sustained in the following amounts by final order entered on May 27, 1947:

| Fund | | |
|---|---:|---|
| Building | $ 625,540 | Items appropriated in improper fund |
| Playground | 10,000 | Item appropriated in improper fund |
| Free Textbook | 18,000 | Item appropriated in improper fund |
| Refunding Bonds of 1935 (1st Series) | 253,433 | 1/11 Invalid bond issue |
| Refunding Bonds of 1935 (2nd Series) | 366,069 | Invalid bond issue |
| | $1,273,042 | |

Between the date of the final judgment sustaining the objections and January 1, 1948, $496,198.70 was refunded by the collector to taxpayers who had filed objections to items held illegal. As of the latter date, the 1942 taxes had been collected and distributed in the amount of $61,-975,271.14 and were still in the process of collection and distribution. Refunds were still being made.

The objector contends that when refunds have been made by the collector to objecting taxpayers on account of items in a levy which have been declared invalid, the law imposes a duty on the taxing body to readjust the distribu-

tion of taxes already received on account of the levy in question which it has theretofore made among its various funds, and so to arrange the distribution of further collections as to confine all losses in revenue due to refunds to the fund or funds which contained the illegal items. As has been stated, this was not done by the board, but instead tax collections were distributed *pro rata* among the funds in accordance with the original levy. It is the objector's position that as a result of the *pro rata* distribution among all funds of tax moneys received on account of the 1940, 1941, and 1942 levies, interfund debts and interfund credits were created, and that the omission of such interfund debts, and particularly the omission of the corresponding credits, from the 1948 budget resulted in an understatement of the assets of the creditor funds.

According to the undisputed testimony, computations made in accordance with the objector's theory would establish the following interfund debts and credits as of January 1, 1948:

| Creditor Funds | Debtor Funds | |
| --- | --- | --- |
| Fund | Building Fund Owes | Bond and Interest Fund Owes |
| Educational | $367,896.89 | $825,811.23 |
| Free Textbook | 3,597.68 | 8,075.64 |
| Playground | 841.50 | 1,888.90 |
| Teachers' Pension | 12,763.98 | 28,651.06 |
| Total | $385,100.05 | $864,426.83 |

Understatement of the assets of the creditor funds in the 1948 budget has resulted, the objector contends and the county court held, in 1948 levies for those funds which are excessive to the amount of the omitted credits.

Neither statutory provisions, which control in rather minute detail the financial operations of the board, nor the decisions of this court, deal specifically with the problem here involved. The objector rests his case upon the settled

propositions that money derived from a levy for one purpose cannot be spent for another purpose, and that funds cannot be commingled, (*People ex rel. Schlaeger* v. *Richè,* 396 Ill. 85; *City of Joliet* v. *Alexander,* 194 Ill. 457; *Knopf* v. *People ex rel. City of Chicago,* 185 Ill. 20,) and upon those cases in which this court has recognized the validity of temporary interfund loans made in order to preserve the credit of the public body, and has sustained taxes levied to repay such loans. (*People ex rel. Brenza* v. *Gilbert,* 409 Ill. 29; *People ex rel. McDonough* v. *New York Central Railroad Co.* 355 Ill. 80; *Gates* v. *Sweitzer,* 347 Ill. 353.) These principles are said to require, by logical compulsion, the recognition of the asserted interfund obligations in the present case.

The major contentions of the collector are that *pro rata* distribution of tax collections among the funds of a taxing body is contemplated by statute and, as a practical matter, is essential to the proper discharge of municipal functions; that such distribution does not create interfund obligations; that the omitted credits did not represent funds available for appropriation, and that the objector has not been injured by the method of distribution employed by the board.

The controlling issue is whether or not the statutory scheme for the collection of taxes and the regulation of municipal finance contemplates the recognition of these interfund debits and credits. We turn, therefore, to a consideration of that problem. There is a statutory reference to "inter fund loans" in the provision which prescribes what the annual budget of the board shall contain. It is there required that estimates of the liabilities of the respective funds shall include the amount of all "inter fund loans." (Ill. Rev. Stat. 1951, chap. 122, par. 34-48.) Since no other interfund obligations have been recognized, the reference seems clearly to relate to the type of voluntary interfund loan to protect municipal credit which has been sanctioned by the decisions of this court in *Gates* v. *Sweitzer,*

347 Ill. 353, and other cases. There is, of course, a significant difference between the voluntary interfund transactions there involved, and the credits sought to be established here. Those obligations are voluntarily incurred, and repayment is contemplated from the outset. They are truly "loans." The obligations asserted in this case would not only be involuntarily and retroactively imposed, but it would be beyond the power of the municipality to prevent them. We conclude, therefore, that the imposition of the asserted interfund obligations is not contemplated by this statutory reference to "inter fund loans."

The statute which deals with the refund of taxes paid under protest relates more directly to the present problem. It provides: "Refunds shall be made by the collector in accordance with the final orders of the court, and the amount of such refunds shall be deducted from the taxes of the taxing bodies whose taxes were adjudged illegal, *in the same or a subsequent year.* * * * No protest * * * shall be taken into account or be a cause of delay in the distribution of tax collections among the taxing bodies, but it shall be the duty of the collector to deduct from the taxes of any taxing body *for any year* the amount of any tax *for any year* held illegal by the final order of a court, and use the amount deducted to equalize the distribution." (Ill. Rev. Stat. 1951, chap. 120, par. 675, italics supplied.) This statute, which authorizes the payment of taxes under protest, is concerned with the problem created by the time lag between the collection of taxes and the adjudication of their validity. The 1940 tax levy of the board will illustrate its scope and its operation. Refunds because of illegalities in that levy were required by this statute to be paid from any tax moneys of the board in the collector's hands at the time the refunds were made. The exact dates on which refunds for that year were made are not available, but they cannot have been made until after March 20, 1945, when the invalidity of items in that

levy was established. By that time the bulk of the taxes for the levies of 1940, 1941, 1942, and 1943 had already been collected. The taxes which were then in process of collection were those levied for the year 1944. In the normal course, it is from those taxes that the refunds would have been paid.

The statute assures accurate distribution among the various taxing bodies. It attempts to go no further. So far as the statute is concerned, it affords no assurance to the board that it will ever collect enough money from the balance of its 1940 levy which remains outstanding to reimburse its 1944 levy from which the refunds were paid. Nor does the statute deal with the even greater likelihood that future collections on account of the 1940 levy for those funds which contained the illegal items will not ever amount to enough to reimburse the 1944 levy from which the refunds were made. The General Assembly has recognized the problems which arise from delayed adjudication of the validity of tax levies, and the consequent delayed payment of refunds. It has apparently dealt with the problem so far as was thought feasible. And its method of dealing with the problem strongly suggests that it did not intend to insist upon meticulously precise accounting practices in dealing with tax refunds.

This conclusion is buttressed by a consideration of the actual operation of the taxing system, and of the consequences which would flow from sustaining the objection. The history of the board's 1940 levy is again illustrative. The board's 1940 tax levy ordinance was adopted by the city council of Chicago on January 11, 1940. These 1940 taxes did not go into collection until a year and a half later, on June 1, 1941. Like other Illinois municipalities, the Board of Education financed its operations for the year 1940 by the sale of tax anticipation warrants. All appropriations for 1940 had been spent or had lapsed almost six months before the 1940 tax levy went into

collection, and almost a year before objections to the levy were filed on November 15, 1941. By that date the great bulk of the 1940 taxes had been collected and turned over to the board by the county collector. Further collections of the remaining balance of outstanding taxes continued to be made over the intervening years. The final adjudication of the validity of the 1940 rates did not occur until March 20, 1945. As the tax money was received by the board from the county collector, it was distributed among the various funds of the board, in accordance with the ratio which the levy for each fund bore to the total levy. The objector does not quarrel with this method of distribution. No other method was possible. But the objector contends that it became the duty of the board to readjust its distribution of taxes among its various funds to reflect, so far as taxes actually refunded are concerned, the final determination as to the validity of the levy for each fund.

The paper adjustments involved could, as the objector points out, readily be made in a short space of time by a competent accountant. But the nub of the question is not the facility with which the accounting adjustments can be made. Actual money must back up the accounting entries. To make the adjustments, money must be taken from the funds to which over-distribution has been made and turned over to those funds to which under-distribution was made. There are only two possible ways to get this money—by increasing taxes or by diminishing services. If the offending fund has no surplus cash at the time the adjustment is made, it will be necessary that a tax be levied on account of that fund sufficient to equal the total of the credits due to other funds. That means an additional tax for the offending fund. If, as would be true in many cases, the offending fund is already levying at the maximum permissible rate, the inevitable result will be a curtailment of the school program for the ensuing year. If the offending fund has surplus cash, that cash would be required to

be distributed to the creditor funds. To maintain the same level of service, however, an additional tax would have to be levied for the offending fund; if that levy is already at the ceiling rate, curtailed functions will result.

If in this case the objection should be sustained and the board should determine to make the required adjustment by an additional tax levy, the earliest that the additional money can be raised is in the board's levy for 1953. And if the money to finance the redistribution is to come from a curtailed school program, it is the 1953 school operations which will be affected. Taxes and taxpayers of 1953 would thus be called upon to remedy errors which occurred in 1940. Yet any 1940 taxpayers who felt themselves aggrieved by the defects in that levy could have filed, and presumably did file, objections. Those objections were sustained and the 1940 taxes of those taxpayers who objected were accordingly reduced.

There is no way in which the local governments throughout the State can protect themselves against these consequences. Under our present scheme of collecting taxes and adjudicating the validity of tax levies, almost all of the taxes for a given year will always have been collected, distributed to the municipalities, and by them distributed among their various funds long before the validity of the tax rates is adjudicated. These factors would seem to underlie the legislative recognition that local governments cannot, as a practical matter, be held to what may be technically precise accounting practices in the absence of prompt adjudication of the validity of their tax levies.

Other practical considerations militate against the theory advanced in support of the objection. This objector focuses attention upon the items held illegal in the levies for the years 1940, 1941, and 1942. But the separate funds of the board and of other taxing bodies existed long before 1940, and, of course, illegal items in tax levies did not originate

in that year. With respect to the board, and any other municipality, the status of a particular fund as a debtor or creditor fund and the amount to which that fund is debtor or creditor will vary with the tax years which are taken into account in making the computation. If readjustments are to be compelled, there would seem to be no reason, in the absence of some statutory limitation, for not requiring a comprehensive readjustment instead of a partial one which covers only the period selected by a particular taxpayer. For if one taxpayer may select his period, so may another. And the readjustment impliedly ordered by sustaining the objection of the first taxpayer will surely be inaccurate, and may prove to be a gross distortion, when other years are taken into account. If the board had reflected in its 1948 budget the exact items which are now insisted upon by this objector, another taxpayer could have successfully challenged the validity of the board's budget by directing attention to illegal items in the levies of earlier years.

The record in this case reflects another difficulty with the theory advanced by the objector. The major portion of the asserted interfund obligations stems from levies to pay bonds which have been held to be illegal. (*People ex rel. Schlaeger* v. *Buena Vista Building Corp.* 396 Ill. 164; *People ex rel. Schlaeger* v. *Siebel*, 388 Ill. 98; *People ex rel. Toman* v. *Granada Apartment Hotel Corp.* 381 Ill. 41; *Berman* v. *Board of Education*, 360 Ill. 535.) In the *Granada case* it was held that since the bonds were void, any attempt to set them out as liabilities in the board's balance sheets rendered the resulting tax levy excessive. If the payment of refunds on account of taxes levied for these illegal bond issues is held to result in corresponding credits to other funds of the board, money must be forthcoming to support those credits. The only source from which it can come is from the levy of additional taxes.

Yet we have squarely held that these very bond issues are ineffective to support a tax.

The difficulty which exists with respect to the illegal bond funds involved in this case would apparently exist with respect to any refunds which resulted from a tax levied for a purpose completely beyond the authority of the taxing body. So it would seem to be impossible to confine all losses due to refunds to the particular funds which contained the illegal items which gave rise to the refunds. The objector's theory could be applied only in those instances in which the purpose for which the tax was levied was a proper purpose of the municipality, but the tax was levied for the wrong fund. It is at this very point, however, that the objector's argument is least convincing. The illegalities in the building fund tax levies in this case, for example, arose because appropriations were made from that fund for the purchase of articles of equipment which were held to be the responsibility of the educational fund. (*People ex rel. Schlaeger* v. *Reilly Tar & Chemical Corp.* 389 Ill. 434.) Yet if the building fund had not furnished the money with which the particular articles there involved were purchased, the educational fund would have had to do so. In the law generally, apart from the field of municipal finance, the discharge by one of the obligation of another historically gave rise to a cause of action upon the common counts for reimbursement. Yet here, it is contended, not only does the building fund have no claim against the educational fund by reason of the burden of the educational fund which it has discharged; to the contrary, having levied one tax which inured to the benefit of the educational fund, it is said that the building fund is now required to levy another tax to reimburse the educational fund because of refunds resulting from objections to the first tax. The contention is not persuasive.

It is axiomatic that in the construction of statutes an interpretation which would produce mischievous or absurd

results should be avoided. (*People ex rel. Prindable* v. *New York Central Railroad Co.* 397 Ill. 50; *Moyer* v. *Board of Education,* 391 Ill. 156; *Lubezny* v. *Ball,* 389 Ill. 263.) That approach is appropriate here, where the objector's claim is distilled from statutes and decisions which do not bear directly upon the problem. It is unnecessary to consider other matters argued by the collector, for we conclude that the method employed by the board in distributing its tax collections among its various funds did not give rise to interfund debits and credits.

The judgment of the county court of Cook County is therefore reversed, and the cause is remanded to that court, with directions to overrule the amended objection.

*Reversed and remanded, with directions.*

Mr. JUSTICE FULTON, dissenting:

I cannot agree with the majority opinion in this case. It appears to me that the law is well settled in Illinois that money derived from a tax levy for one purpose cannot be spent for another purpose; that the funds cannot be commingled, and that taxes are in effect a trust fund to be used only for the purpose levied. *Knopf* v. *People ex rel. City of Chicago* 185 Ill. 20; *People ex rel. Schlaeger* v. *Richè,* 396 Ill. 85.

It is my conclusion that if taxpayers have the right to know the purposes for which money raised by taxes is to be spent, and to be assured that, when raised, it will be spent for those purposes, it is equally true that the taxpayer has the right to insist that any losses of revenue due to refunds occasioned by an illegal levy, be confined to those funds and purposes for which the appropriated funds were originally proposed to be spent.